## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHARLES CRAWFORD,**                                   **CIVIL ACTION**
     **Plaintiff**


**VERSUS**                                              **NO.  13-445**


**BP CORPORATION NORTH**                                **SECTION: "E" (4)**
**AMERICA INC., ET AL.,**
     **Defendants**

## ORDER AND REASONS

This is a maritime action arising on a platform (the "MARLIN") located on the Outer Continental Shelf ("OCS").  During the course and scope of his employment with BP America Production Company ("BP America"), Charles Crawford ("Crawford") sustained personal injury when another worker—Blain Matthew ("Matthew")—dropped a vacuum pump on his back.  Crawford has filed suit against Matthew's employer, Danos and Curole Marine Contractors, L.L.C. ("Danos").  Danos responded with a motion for summary judgment.[1]  The question presented is whether Matthew is a borrowed employee of BP America.  If so, Crawford has no cause of action against Matthew, and, by extension, Danos.

For the following reasons, the Motion is GRANTED, and Crawford's claims against Danos are DISMISSED WITH PREJUDICE.  Because the claims of Intervenor Plaintiff BP America are premised on the viability of Crawford's claims against Danos, BP America's claims are DISMISSED WITH PREJUDICE as well.

---

[1] R. Doc. 70.

1

## BACKGROUND

BP America employs Crawford as an electrician assigned to the MARLIN—a tension leg platform owned by BP Exploration & Production, Inc. ("BP Exploration"). On March 9, 2012, Crawford was injured aboard the MARLIN when Matthew dropped a vacuum pump on his lower back.  Danos is Matthew's payroll employer.

Crawford filed suit against BP America, BP Exploration, and Danos.[2]  Danos answered and asserted a crossclaim against BP America for indemnity.[3]  The Court transferred the crossclaim to the Southern District of Texas.[4]  Crawford subsequently dismissed his claims against BP America and BP Exploration,[5] leaving Danos as the sole defendant.  BP America then intervened as a plaintiff, seeking subrogation for payments made to Crawford under the Longshore and Harbor Workers' Compensation Act (the "Longshore Act").[6]

Danos has filed a motion for summary judgment, arguing that Matthew is a borrowed employee of BP America.  After the motion came under submission, the Court allowed Crawford to further supplement his opposition.[7]  Crawford filed a supplemental memorandum,[8] and Danos filed a response.[9]

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[2] *See* R. Docs. 1, 18.
[3] R. Doc. 20.
[4] R. Doc. 34.
[5] R. Docs. 40, 51.
[6] 33 U.S.C. § 901 *et seq.*
[7] R. Doc. 91.
[8] R. Doc. 92.
[9] R. Doc. 93.

matter of law."[10]  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[11]  The Court reviews the evidence in the light most favorable to the non-moving party.[12]

## DISCUSSION

Liability in this case depends on the interplay between the Outer Continental Shelf Lands Act ("OSCLA"),[13] the Longshore Act, and the "borrowed employee" doctrine. The OSCLA extends the Longshore Act to certain injuries occurring on the OCS.[14]  The Longshore Act prohibits an injured employee from suing "persons in the same employ" for negligence.[15]  This prohibition extends to suit by one employee against a borrowed employee of the same employer.[16]    In other words, Crawford (as an employee of BP America) has no cause of action against Matthew if Matthew is a borrowed employee of BP America. If there is no cause of action against Matthew, the predicate for *respondeat superior* liability is missing, and there can be no cause of action against Matthew's nominal employer, Danos.[17]  Thus, the viability of Crawford's claims against Danos turns on whether Matthew is a borrowed employee of BP America.

The borrowed employee doctrine evolved in the tort context but has since been applied to cases arising under the Longshore Act.[18]  Whether Matthew was a borrowed employee is a question of law,[19] and "if sufficient basic factual ingredients are

---

[10] Fed. R. Civ. P. 56(a).

[11] *Thorson v. Epps*, 701 F.3d 444, 445 (5th Cir. 2012).

[12] *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

[13] 43 U.S.C. § 1331 *et seq.*

[14] 43 U.S.C. § 1333(b); *Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 687 (2012).  The parties do not dispute that the Longshore Act applies in this case.

[15] 33 U.S.C. § 933(i).

[16] *Perron v. Bell Maint. & Fabricators, Inc.*, 970 F.2d 1409, 1412 (5th Cir. 1992).

[17] *See id.* at 1412–13.

[18] *Total Marine Servs. v. Dir., Office of Worker's Compensation Programs, U.S. Dept. of Labor*, 87 F.3d 774, 777 (5th Cir. 1996).

[19] *Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 393 (5th Cir. 2013).

undisputed, the court may grant summary judgment."[20]  The Fifth Circuit has set forth

nine factors that are determinative of borrowed employee status:

> (1) Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?
> (2) Whose work was being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished tools and place for performance?
> (7) Was the new employment over a considerable length of time?
> (8) Who had the right to discharge the employee?
> (9) Who had the obligation to pay the employee?[21]

Although no single factor or combination of factors is dispositive, the Fifth Circuit "has

considered the first factor—control—to be the central factor."[22]

I. <u>Who had control?</u>

The first factor requires a court to distinguish "between authoritative direction

and control, and mere suggestion as to details . . . where the work furnished is part of a

larger undertaking."[23]  When Matthew arrived on the Marlin for a hitch, he logged into a

computer site which listed the tasks he was to perform for that particular hitch.  BP

America prepared the task list.

On the morning of each work day, Matthew attended a meeting led by BP

America.  At this meeting, BP America determined which of the scheduled tasks would

---

[20] *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 617 (5th Cir. 1986).

[21] *Billizon v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir. 1993).

[22] *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 677 (5th Cir. 1993) (per curiam) (collecting cases).  *But see Gaudet v. Exxon*, 562 F.2d 351, 357 (5th Cir. 1977) (emphasizing fourth, fifth, sixth, and seventh factors).

[23] *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 313 (5th Cir. 1969) (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 222 (1909)).

be performed that day.  Prior to beginning any work, Matthew would complete a work permit, which had to be approved by a BP America supervisor.

Danos did not supervise or control Matthew's work on the MARLIN. In fact, Matthew's supervisor at Danos, Mike Guidry, worked from an onshore office.

These basis facts are undisputed.  To create a factual dispute, Crawford points to an Employee Safety Handbook that Danos provided to its employees.[24]  Crawford does not reference any particular portion of the handbook or explain how the handbook is relevant to the issue of control.

The summary judgment record is clear that BP America exercised authoritative control over Matthew's work on the MARLIN.  No reasonable juror could find otherwise.  The first factor weighs in favor of borrowed employee status.

II.  <u>Whose work was being performed?</u>

Matthew performed BP America's work.  This factor weighs in favor of borrowed employee status.

III.  <u>Was there an agreement or understanding between Danos and BP America?</u>

Matthew and other Danos employees worked aboard the MARLIN pursuant to a Master Service Contract ("MSA") between Danos and BP America.  The MSA provides in pertinent part as follows:

> "[Danos] is an independent contractor, shall control the performance of the details of the Work, and shall be responsible for ensuring that the performance of the Work is conducted in a manner consistent with appropriate safety, health, and environmental considerations . . . .  [Danos's] employees . . . [shall not be] deemed for any purpose to be agents, servants, or representatives of [BP America] in the performance of the Work.   [BP America] shall have no direction or control of the members of [Danos] in the

---

[24] *See* R. Doc. 92, p. 2.

performance of the Work and is interested only in the results obtained."[25]

The MSA purports to prohibit Matthew's borrowed employee status.  "Obviously parties to a contract cannot automatically prevent a legal status like 'borrowed employee' from arising merely by saying in a provision in their contract that it cannot arise."[26]  The MSA provides that Danos will control all aspects of the work performed on the MARLIN.  The reality at the worksite, however, was the exact opposite: BP America controlled and supervised Matthew's work in all material respects.  The Court finds that the parties' actions in carrying out the MSA impliedly modified or waived the provision regarding control.[27]  The parties had a tacit understanding that BP America would exercise control over Matthew.  Therefore, the third factor weighs in favor of borrowed employee status.[28]

## IV.  Did Matthew acquiesce?

"The focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them."[29]  Matthew applied with Danos for a position on the MARLIN.  At the time he was hired, Matthew was aware of the agreement between Danos and BP America.  Matthew testified that he was "cool with" working on the MARLIN under BP America supervision and that he hoped to eventually

---

[25] R. Doc. 74-3, ¶¶ 7.01, 7.02.

[26] *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988).

[27] *See Brown*, 984 F.2d at 678 ("The parties' actions in carrying out the contract can impliedly modify or waive the express provision.").

[28] *See Robertson v. W & T Offshore, Inc.*, 712 F. Supp. 2d 515, 531–32 (W.D. La. 2010) (finding third factor weighed in favor of borrowed employee status where parties implicitly waived or modified borrowing agreement); *Melancon*, 834 F.2d at 1245.

[29] *Brown*, 984 F.2d at 678.

work for BP America directly.  The fourth factor clearly weighs in favor of borrowed employee status.[30]

V.  <u>Did Danos terminate its relationship with Matthew?</u>

This factor does not require the lending employer to completely sever its relationship with the borrowed employee.[31]  Instead, the focus is "on the lending employer's relationship with the employee while the borrowing occurs."[32]  As set forth above, Danos exercised little to no control over Matthew while he worked for BP America and placed no restrictions on BP America with respect to Matthew's employment.  Therefore, this factor weighs in favor of borrowed employee status.[33]

VI.  <u>Who furnished the tools and place for performance?</u>

The place for performance was the MARLIN, which is owned and operated by BP Exploration (not BP America).  The MSA explicitly provides as follows: "[Danos] shall furnish at its own expense, cost and discretion any and all necessary . . . protective equipment, machinery, equipment, [and] tools . . . ."[34]  Once again, the reality at the worksite varies from the terms of the MSA.  Matthew did not bring any tools on the MARLIN.  All of his tools were provided by BP America.  Some of these tools were specifically requested by Matthew.  Although BP America provided the tools, it is unclear who paid for the tools.  On balance, and viewing the evidence in the light most favorable to Crawford, this factor is neutral.

---

[30] In his opposition memorandum, Crawford concedes this factor favors borrowed employee status.  *See* R. Doc. 74, p. 7 ("It is difficult to argue that Mr. Matthew did not acquiesce in his work situation, which is the fourth factor.").

[31] *Capps*, 784 F.2d at 617.

[32] *Id.* at 618.

[33] *See id.* (finding fifth factor weighed in favor of borrowed employee status in substantially similar circumstances).

[34] R. Doc. 74-3, ¶ 8.01

VII.  <u>Was Matthew's "employment" with BP America over a considerable length of time?</u>

Matthew worked aboard the MARLIN for over two years.  This factor clearly favors borrowed employee status.

VIII.  <u>Who had the right to discharge Matthews?</u>

The proper focus under this factor is whether the borrowing employer had the right to terminate the borrowed employee's services with itself.[35]  BP America had the right to discharge Matthew from the MARLIN.  This factor clearly weighs in favor of borrowed employee status.

IX.  <u>Who had the obligation to pay Matthew?</u>

Matthew completed daily time sheets and submitted them to Danos.  Danos would then forward the time sheets to BP America for approval.  If approved, Danos would pay Matthew for the hours worked.  The Fifth Circuit has held this type of arrangement supports borrowed employee status.[36]

## CONCLUSION

Every factor but the sixth (which is neutral) weighs in favor of borrowed employee status.  In light of the undisputed facts in this case, the Court finds as a matter of law that Matthew was BP America's borrowed employee.  Accordingly, Crawford has no cause of action against Matthew or Matthew's nominal employer, Danos.  Since Crawford's claims against Danos must fall, so too must BP America's intervening claims for subrogation.

---

[35] *Capps*, 784 F.2d at 618.
[36] *See Brown*, 984 F.2d at 678 (finding ninth factor weighed in favor of borrowed employee status where borrowed employee was paid by nominal employer based on time sheets verified daily by the borrowing employer).

New Orleans, Louisiana, this 13th day of March, 2015.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**